IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 24, 2021 Session

## STATE OF TENNESSEE v. CHRISTOPHER SCOTT MONTELLA

**Appeal from the Circuit Court for Marshall County**
**No. 18-CR-147      M. Wyatt Burk, Judge**

### No. M2020-00016-CCA-R3-CD

The Defendant, Christopher Scott Montella, was convicted by a Marshall County Circuit Court jury of aggravated sexual battery, a Class B felony. *See* T.C.A. § 39-13-504 (2018). He received a sentence of eleven years. On appeal, the Defendant contends that (1) the evidence was insufficient to support the Defendant's conviction, (2) the trial court erred by denying the Defendant's motion to sever, (3) the trial court erred by denying the Defendant's motion to suppress evidence obtained during a search, (4) the Defendant suffered a violation of *Brady v. Maryland* 373 U.S. 83 (1963) when the State failed to inform the Defendant the victim's trial testimony would be different than the victim's previous testimony, (5) the trial court erred by denying the Defendant's motion for a mistrial based on juror misconduct, and (6) the trial court erred by sentencing the Defendant to eleven years. We conclude that the trial court erred by denying the Defendant's motion to sever; however, the error was harmless. We reverse the Defendant's conviction based on juror misconduct and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed;
Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Jonathan William Turner (at trial and on appeal), Franklin, Tennessee, for the appellant, Christopher Scott Montella.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Robert J. Carter, District Attorney General; and Andrew L. Wright and William Bottoms, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

A Marshall County grand jury indicted the Defendant for aggravated sexual battery and sexual exploitation of a minor by electronic means for conduct involving the victim. The Defendant's jury trial began on August 9, 2019.

At the Defendant's trial, Lewisburg Police Department (LPD) Detective Santiago McKlean testified that he investigated sexual crimes. Detective McKlean said that on January 30, 2018, he began investigating the Defendant after the male victim and the victim's mother, M.T., filed a police report. He said the victim's forensic interview occurred on January 31, 2018. Detective McKlean said the Defendant was age twenty-eight and the victim was age eleven. Detective McKlean said that he obtained a warrant on February 1, 2018, and executed a search of the Defendant's camper. Detective McKlean said that during the search, he found clothing that belonged to the victim, a "personal lubricant called Astroglide," and a four-foot high teddy bear. Detective McKlean said finding the lubricant corroborated the victim's statement. Detective McKlean said that after he investigated the allegations, the Defendant was charged with aggravated sexual battery and sexual exploitation of a minor by electronic means.

M.T. testified that she and her husband, the victim's father, had two daughters and one son. At the time of the trial, one daughter was age twenty-two, one daughter was age twenty, and the victim was age twelve. M.T. said that the victim was homeschooled and enjoyed "anything mechanics," video games, and watching Netflix, but the victim suffered from severe headaches and abdominal pain, which were exacerbated by stress. She said that she and her family attended church, that Pamela Grey and her nephew, the Defendant, attended the same church, and that Ms. Grey introduced the Defendant to M.T. and her family. M.T. said that the Defendant had driven a truck to church, that the victim talked to the Defendant about the truck, and that the Defendant asked the victim if he wanted to help the Defendant work on the truck. She said the Defendant asked for her telephone number so that he could ask her permission for the victim to spend time with the Defendant.

M.T. testified that the January 2018 incident occurred three or four months after she met the Defendant. She said during the months leading up to the incident, the Defendant came to her home several times to play video games with the victim. She said the Defendant also took the victim to the movies, swimming, and to a place called "Sky Zone." She said she trusted Ms. Grey and was comfortable with the situation. She explained that she trusted the Defendant and that the victim appeared to trust him, too. M.T. said that the victim considered the Defendant to be a "bigger brother," that the victim called the Defendant "Bro," and that the Defendant called the victim "little Bro." M.T. said that the Defendant would call and text the victim and that on approximately four occasions, the victim spent the night with the Defendant in the Defendant's camper, located behind Ms. Grey's house.

-2-

M.T. testified that the victim enjoyed watching television and that she did not allow him to watch anything with adult ratings. She said that after the victim told her he had watched "Big Mouth," she viewed the show. She said "Big Mouth" was a "very sexual-oriented cartoon," which included references to masturbation and sex. M.T. said this was not a show she would allow the victim to watch.

M.T. testified that on January 30, 2018, the victim came home from the Defendant's home and was crying and upset. She explained that after talking with the victim, she called her husband and told him to meet her and the victim at the police station. She said she went to the police station and made a report based on what the victim had told her. She said the victim gave a forensic interview. M.T. said that after January 30, she had concerns about the Defendant and no longer allowed the victim to spend time with the Defendant. She explained that after January 30, the victim became emotional and cried often when trying to discuss the incident with her and her husband.

M.T. testified that on one occasion prior to January 30, the Defendant bought shoes for her family. She said the Defendant also gave her approximately $200 to help remodel her home. She explained that she and her family were having financial difficulties and that they accepted the Defendant's unsolicited aid.

The victim testified that he knew Ms. Grey from church and as a family friend. The victim said he enjoyed mechanics and watching television, including shows on Netflix. The victim said he was age eleven when the incident with the Defendant occurred. The victim said that he told his mother about the incident the same day it occurred and that she took him to the police station. The victim explained that the incident with the Defendant caused him to have emotional "breakdowns."

The victim testified that the Defendant was Ms. Grey's nephew and that several months before January 30, Ms. Grey introduced the Defendant to him at church. The victim explained that he saw the Defendant's truck at church, that he asked the Defendant questions about the truck's engine, and that the Defendant suggested that they "hang[] out" sometime. The victim said that he asked his mother's permission and that he spent time with the Defendant on approximately eight occasions before January 30. The victim said the Defendant took him to the pool and a trampoline park. The victim said the Defendant also spent time with the victim at the victim's home. He said on three occasions, he spent the night at the Defendant's camper, which was located behind Ms. Grey's home. The victim said that during the time he spent with the Defendant, the victim thought the Defendant was "cool," considered him to be a "big brother," and trusted the Defendant. The victim said that when he visited the Defendant's camper, he and the Defendant played video games and watched television. The victim said that the Defendant told him "what happens in the camper stays in the camper." The victim said that on one occasion, he and the Defendant watched "a very ugly show" called "Big Mouth," which was a Netflix show about masturbation and that it was the Defendant's idea to watch it. The victim said that

-3-

some of the show's characters "performed masturbation" and that this was not a show the victim wanted to watch. The victim said after he realized what was happening on the show, he switched to a different show. The victim said that on another occasion, the Defendant asked the victim if he masturbated.

The victim testified that the victim spent the night before the January 30 incident in the Defendant's camper and slept in a bed with the Defendant. The victim said the Defendant "ripped off" the victim's pants, but the victim put them back on. The victim said the Defendant told him that there was "a cream for my privates" and that the Defendant was the only one who could put it on the victim. The victim said he wore jeans to bed. The victim said he fell asleep and awoke when the Defendant put his hand in the victim's pants and touched his penis. The victim said that he hit the Defendant, that the Defendant attempted to touch the victim's penis again, and that the victim "choked" the Defendant. The victim said the Defendant told him he attempted to "adjust" the victim's penis. The victim said that the next morning the Defendant took him swimming and that the victim was nervous. The victim said that the Defendant took the victim to Ms. Grey's house and that the victim's grandfather picked him up and took him home. The victim said that when he got home, he told his mother about the Defendant's touching his penis. The victim acknowledged that when he had previously discussed the incident, he did not remember that the Defendant slept in the same bed as the victim. The victim said that prior to the Defendant's touching him, he had no reason to be angry with the Defendant and no reason to make up a story about the Defendant.

On cross-examination, the victim acknowledged that at the preliminary hearing, he did not say the Defendant slept all night in the same bed as the victim but said the Defendant got in bed with him at 4:00 a.m. and slept there for the rest of the night. The victim said that he had not lied but that he had remembered the incident differently at the preliminary hearing. The victim agreed that during his forensic interview on the day after the incident, he did not mention the Defendant's sleeping with him in the bed all night. The victim said that the week before the trial was the first time he remembered the Defendant's sleeping in the bed with him all night and that he contacted the prosecutor. The victim agreed that on the previous occasions he stayed overnight at the Defendant's camper, he and the Defendant slept in different beds.

Pamela Grey testified that she was the Defendant's aunt and that he lived in a camper behind her home so that he could help care for her after she had surgery. Ms. Grey said the Defendant attended church with her and that the Defendant met the victim and the victim's family at church. Ms. Grey explained that her husband suggested the Defendant allow the victim to help him with the Defendant's truck because the victim enjoyed working on vehicles. Ms. Grey said that the victim would visit the Defendant at her home and that on several occasions the victim and the Defendant ate dinner, watched movies, spent time outside, and played video games. Ms. Grey said the Defendant helped the victim's family financially. Ms. Grey said that on one occasion, she and her husband

-4-

watched a movie with the victim and the Defendant and that she noticed the victim get out of a chair and sit with the Defendant on a couch. She said the Defendant told the victim to get off the couch, and the victim got off the couch but sat back down on the couch with the Defendant. Ms. Grey said the Defendant moved off the couch and was "disturbed" by the victim's behavior. Ms. Grey said that she and her husband did not think this was "acceptable behavior" and called the victim's parents but that the victim's parents were not worried and explained that the victim was a "very affectionate child."

Ms. Grey testified she attended the Defendant's preliminary hearing. She said she watched the victim's testimony and observed him watch his mother, who gave him nonverbal cues. Ms. Grey explained that after almost every question, she saw the victim look at his mother, who shook her head yes or no. Ms. Grey said this continued during the victim's testimony.

On cross-examination, Ms. Grey testified that when the victim spent the night with the Defendant, the two stayed in the camper behind her home. Ms. Grey confirmed that there were times when the victim and the Defendant were alone together.

Ms. Grey testified she saw the victim when he and the Defendant came back from the pool after the January 30 incident. Ms. Grey said she prepared food for the victim and had a normal interaction with him. She said that the Defendant was present and that the victim did not appear anxious or scared.

Mamie Cochran testified that she was present at the Defendant's preliminary hearing. She said that when the victim testified, he looked at his mother after each question. She said M.T. either shook her head "no" or nodded her head "yes." Ms. Cochran said this occurred throughout victim's testimony.

The Defendant testified that he lived in a camper behind Ms. Grey's home. The Defendant said that he attended church with Ms. Grey and that she and her husband introduced the Defendant to the victim and his parents. The Defendant explained that Ms. Grey's husband told him the victim enjoyed working on vehicles and suggested the Defendant could teach the victim how truck engines work. The Defendant said that he went to the victim's home and that he asked the victim's mother's permission to spend time with the victim. The Defendant said M.T. wanted the Defendant to talk to the victim and get to know him before she would allow them to spend time together. The Defendant said that he had a good conversation with the victim and that they did various activities together. The Defendant said that he took the victim swimming, to the movies, and to Sky Zone; that they played in the snow at Ms. Grey's home; and that he played video games and watched movies with the victim at the victim's home. The Defendant said he acted as a "big brother" to the victim, that he called the victim "little brother," and that the victim called him "big brother." The Defendant said that he always sought permission to spend time with the victim and that he never spent time with the victim without the victim's parents' knowledge. The Defendant said that on one occasion he purchased clothing and shoes for

-5-

the victim's family and that he fixed things in the victim's home and gave the family money for home repairs.

The Defendant testified that he never touched the victim's "private parts." The Defendant said that he never asked the victim if he could touch the victim, that the victim never touched the Defendant, and that the Defendant never exposed himself to the victim. The Defendant said that on one occasion, he discussed masturbation with the victim because he knew that the victim's parents were "against masturbation and talking about" it. The Defendant explained he brought up the subject of masturbation so that the victim could discuss it if he wanted. The Defendant said that on one occasion, he was making breakfast and realized that the show Big Mouth was playing. He said as soon as he realized the victim was watching the show, the Defendant turned it off because it was inappropriate for the victim. The Defendant explained Big Mouth was an animated show that discussed puberty but did not depict sexual activity. The Defendant said that he did not observe masturbation or nudity in the show. The Defendant said the show was not X-rated, was not pornography, and was accessed through Netflix. The Defendant said that on a few occasions, the victim spent the night with the Defendant with the victim's parents' permission.

The Defendant testified he never made sexual advances toward the victim. The Defendant said that he and the victim swam the morning after the January 29 sleepover and that the victim's demeanor was normal. He said the victim hugged him and told the Defendant, "I love you," before leaving. The Defendant said he never threatened the victim and never assaulted him. The Defendant said that he took medication for sleeping and that he had taken the medication on the night of January 29. He said the medication turned him "into a zombie" and that he was "out cold" when he took it. The Defendant said that he did not sleep in the same bed with the victim and that he did not get into bed with the victim at 4:00 a.m. on January 30. The Defendant said he did not take off the victim's pants or reach into the victim's pants to grab his penis. The Defendant said he was not sure why the victim had made these accusations against him. The Defendant said that he was possibly moving away from the area and would no longer be able to spend time with the victim. He said that the victim knew this and that this was possibly why the victim made allegations.

On cross-examination, the Defendant testified that he had seen the show Big Mouth. He said that he did not turn on the show for the victim and that the victim turned on the show while the Defendant was cooking breakfast. The Defendant stated that he had seen the first season of Big Mouth and that it was rated "TV/MA," meaning "mature audience." He said the show depicted nudity but never showed masturbation. The Defendant said the show was not appropriate for the victim, which was why he turned it off when he realized the victim had turned on the show. The Defendant said he had never discussed the show with the victim. The Defendant said that he never offered to put cream on the victim's

penis and that he never told the victim that he had a cream that would make the victim's penis "tingle."

On rebuttal, M.T. testified that she recalled "vividly" the events of January 30, 2018. She explained that when the victim came home that day, he was anxious, cried, and said he needed to tell her something. M.T. said that she did not "coach" the victim during the preliminary hearing. She said she only nodded her head "yes" one time after the victim questioned whether it was okay to use the word "penis."

Upon this evidence, the jury convicted the Defendant of aggravated sexual battery and acquitted the Defendant of sexual exploitation of a minor by electronic means. Following a sentencing hearing, the trial court imposed an eleven-year sentence. This appeal followed.

## I.     Sufficiency of the Evidence

The Defendant contends that the evidence does not support his conviction for aggravated sexual battery. Specifically, he argues that the victim's testimony was "untruthful and false" because the victim's testimony was inconsistent. The State responds that the evidence is sufficient to support the conviction.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see State v. Vasques,* 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques,* 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given to the evidence . . . are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall,* 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton,* 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes,* 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson,* 279 S.W.3d 265, 275 (Tenn. 2009)).

Tennessee Code Annotated section 39-13-504(a) provides that "[a]ggravated sexual battery is unlawful sexual contact with a victim by the defendant" when the "victim is less than thirteen years of age." Sexual contact "includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching

of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" *Id.* § 39-13-501(6) (2018).

In the light most favorable to the State, the evidence is sufficient to support the Defendant's conviction. The victim testified that he and the Defendant were friends and spent time together. The victim said that he was awakened by the Defendant's touching his penis. The victim said that the Defendant put the Defendant's hand down the victim's jeans and held the victim's penis. The victim was age eleven at the time of the incident. The Defendant argues that the victim's trial testimony is inconsistent with his forensic interview and preliminary hearing testimony. However, "such matters as witness credibility and evidentiary weight are within the exclusive province of the trier of fact, and this court will not reweigh such evidence." *State v. David Black*, No. W2016-02478-CCA-R3-CD, 2017 WL 4217168, at *5 (Tenn. Crim. App. Sept. 21, 2017); *see Bland*, 958 S.W.2d at 659; *Sheffield*, 676 S.W.2d at 547. The jury accredited the victim's testimony, and this court will not reweigh the evidence. The Defendant is not entitled to relief on this basis.

## II. Denial of Severance of Offenses

The Defendant argues that the trial court erred in denying his motion to sever the counts on the basis that the aggravated sexual battery and the sexual exploitation of a minor by electronic means charges were unrelated and that there was no specific date referenced for the sexual exploitation charge, thus increasing the likelihood that it was unrelated to the aggravated sexual battery charge. The State responds that the trial court did not err in denying the Defendant's motion.

Tennessee Rule of Criminal Procedure 8(b) provides the following with regard to joinder of offenses:

(b) **Permissive Joinder of Offenses.**—Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13, if:

(1)     the offenses constitute parts of a common scheme or plan; or

(2)     they are of the same or similar character.

Tennessee Rule of Criminal Procedure 14(b) provides, in pertinent part:

(b) **Severance of Offenses.—**

(1) **Involving Permissive Joinder of Offenses.—** If two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others.

Moreover,

Offenses permissively joined by the prosecution (or by the court) may be severed upon motion by the defendant as a matter of right, with one exception: where the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others.

Tenn. R. Crim. P. 14(b), Comm. Cmts.

When considering a motion to sever, the trial court

must conclude that: (1) the offenses are part of a common scheme or plan; (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses, Tenn. R. Evid. 404(b)(2); and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission would have on the defendant, Tenn. R. Evid. 404(b)(3); *Spicer* [*v. State*, 12 S.W.3d 438, 445 (Tenn. 2000).]

*State v. Denton*, 149 S.W.3d 1, 13 (Tenn. 2004). Proof of a larger "plan or conspiracy . . . contemplates crimes committed in furtherance of a plan that has a readily distinguishable goal, not simply a string of similar offenses." *Id*. at 15.

If a defendant seeks a severance of offenses that have been joined in the original indictment pursuant to Rule 8(b), he has the burden to assert his right to a severance pursuant to Rule 14(b)(1) or it will be waived. *Spicer*, 12 S.W.3d at 443. The trial court must grant the motion for a severance unless the offenses involve a common scheme or plan. Tenn. R. Crim. P. 14(b)(1). Permitting or denying a motion to sever is within the discretion of the trial court. *State v. Meeks*, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993); *see State v. Coleman*, 619 S.W.2d 112, 116 (Tenn. 1981). This court reviews a trial court's decision to grant or to deny a motion to sever for an abuse of discretion. *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). An abuse of discretion occurs when a "trial court applie[s] an incorrect legal standard or reache[s] a decision against logic or reasoning

which cause[s] an injustice to the complaining party." *Denton*, 149 S.W.3d at 10 (citing *Spicer*, 12 S.W.3d at 442).

At the hearing on the motion to sever, LPD Detective Santiago McKlean testified that in January 2018 he investigated the allegations. Detective McKlean said that the victim gave a forensic interview shortly after Detective McKlean learned of the allegations. Following the victim's interview, the Defendant was charged with aggravated sexual battery and sexual exploitation of a minor by electronic means. Detective McKlean said he learned that one week before the aggravated sexual battery, the Defendant allowed the victim to watch Big Mouth. Detective McKlean said that he researched Big Mouth and discovered that it contained sexual themes and was rated for "mature audiences." Detective McKlean testified that based on specialized training, he observed signs of grooming in the relationship between the Defendant and the victim. He defined "grooming" as a way of "attracting" or "enticing" minors through the use of candy or sporting events in exchange for "friendship." Detective McKlean said that the Defendant took the victim many places such as Sky Zone, recreation centers, and the Defendant's camper. Detective McKlean said the Defendant had a large teddy bear in his camper and that the victim enjoyed playing with this teddy bear. Detective McKlean learned that the Defendant allowed the victim to watch other content on Netflix before the victim viewed Big Mouth. Detective McKlean said that he learned from the victim that Big Mouth portrayed masturbation. Detective McKlean said he discovered that the Defendant told the victim about a cream that would "make [the victim's] private parts tingl[e]" and that a search of the Defendant's camper yielded a cream called "Astrogel," which corroborated the victim's version of events.

The State argued that the counts were "inextricably related" because they were part of a common scheme or plan. The State argued that the Defendant showed the victim a sexually explicit program in an effort to groom him so that one week later the Defendant could commit the act of aggravated sexual battery on the victim. The State argued that the facts of both counts would be admissible at trial to reveal the Defendant's motives for showing the victim the program and for committing the sexual battery.

The defense argued that the aggravated sexual battery and the exhibition of Big Mouth were not part of a common scheme or plan and should not be consolidated. The defense argued that the program was not pornography, that it was unrelated to the alleged sexual battery that occurred one week later, and that admitting this as evidence would be substantially prejudicial to the Defendant. The defense argued that one week between the two incidents was too long of a period to establish a common scheme or plan. The defense said that the two incidents were not similar, arguing that the law treats exhibiting pornography to a child as a less serious offense than aggravated sexual battery.

At the conclusion of the hearing, the trial court denied the Petitioner's motion to sever the counts.

In a written order denying the Defendant's motion to sever, the trial court found that the evidence demonstrated a common scheme or plan which linked the charged offenses, noting that the Defendant established a friendship with the victim by taking him to recreational activities. The court found that the Defendant attempted to "groom" the victim by taking him places and by allowing him to watch Big Mouth. The court noted that the alleged aggravated sexual battery occurred one week after the Defendant showed the victim the show and concluded that the Defendant's actions "may have culminated in the" aggravated sexual battery. The court found that evidence of each offense would be admissible in the trial of the other offense pursuant to *State v. Rickman*, 876 S.W.2d 824 (Tenn. 1994), and that the probative value of the evidence of each offense was not outweighed by the danger of unfair prejudice.

The evidence at the hearing showed that the Defendant befriended the victim and took the victim on multiple outings. The evidence showed that the Defendant allowed the victim to view video programming, including Big Mouth, which contained sexual themes and portrayed masturbation. Detective McLean said that he observed signs of the Defendant's grooming the victim, including allowing the victim to watch Big Mouth. Detective McLean testified that he conducted a search of the Defendant's camper and discovered a lubricant, which corroborated the victim's claim that the Defendant showed the victim a cream that would "make [the victim's] privates tingl[e]." The Defendant confirmed his spending a lot of time with the victim and asking the victim if the victim masturbated. The Defendant took the victim on many outings and spent time alone with the victim in the Defendant's camper.

Here, it appears that the two charges are part of a common scheme or plan. Evidence of the Defendant's allowing the victim to view Big Mouth would be admissible at the aggravated sexual battery trial as evidence of the Defendant's grooming the victim. However, the evidence of the aggravated sexual battery would not be admissible at the trial for the sexual exploitation of a minor by electronic means charge. Evidence of the aggravated sexual battery would not be relevant in establishing the elements of the sexual exploitation charge. Moreover, the aggravated sexual battery evidence would be propensity evidence at the sexual exploitation trial. *See State v. Denton*, 149 S.W.3d 1, 13 (Tenn. 2004). Thus, the trial court abused its discretion in denying the Defendant's request for a severance.

However, the denial of the severance was harmless. *See State v. Moore*, 6 S.W.3d 235, 242-43 (Tenn. 1999). The Defendant was acquitted of the sexual exploitation charge, and any error in denying a severance would have offered potential harm to this count. However, the sexual exploitation evidence was relevant and admissible to the aggravated sexual battery charge. Even if the trial court had granted the severance, the sexual exploitation evidence would have been admissible at the separate aggravated sexual battery trial. The Defendant is not entitled to relief on this basis.

### III.  Suppression of Evidence

The Defendant argues that the trial court erred by denying the motion to suppress the evidence of the seizure of the lubricant from a search of the Defendant's home.  The Defendant argues that the magistrate "failed to make a neutral and detached judgment that probable cause was shown" because the search warrant's affidavit had no time stamp.  The Defendant contends that because there was no time stamp, there was no proof that the affidavit was sworn to before the issuance of the warrant.  The State responds that the trial court did not err in denying the Defendant's motion to suppress because the affidavit was sworn to on the same day the warrant was issued and both were sworn in front of the same magistrate.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them.  *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990).  Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23.  The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001).  A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal.  *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).  In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution "safeguard the privacy and security of individuals against arbitrary invasions of government officials." *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967); *see State v. Hayes*, 337 S.W.3d 235, 251 (Tenn. Crim. App. 2009).  Tennessee Criminal Procedure Rule 41 governs the issuance and execution of search warrants.  Rule 41(c)(1) provides a "warrant shall issue only on an affidavit or affidavits . . . that are sworn before the magistrate and establish grounds for issuing the warrant."  Rule 41(c)(3)(D) states that "[t]he magistrate shall endorse on the search warrant the hour, date, and name of the officer to whom the warrant was delivered for execution."  The purpose of the magistrate's date and time endorsement required by Rule 41(c) is "to ensure that if a search warrant is executed prior to its issuance, such discrepancy will be apparent on the face of the warrant." *State v. Bobadilla*, 181 S.W.3d 641, 645 (Tenn. 2005).

-12-

Rule 41(g)(1) permits

> [a] person aggrieved by an unlawful or invalid search or seizure [to] move the court . . . to suppress any evidence obtained in the unlawful search or seizure . . . . The motion shall be granted . . . if the evidence in support of the motion shows that . . . the search or seizure was made . . . illegally with an invalid search warrant, or in any other way in violation of the constitutional protection against unreasonable searches or seizures[.]

Rule 41(g)(5) also requires suppression of the evidence if "the magistrate did not . . . make an original and two copies of the search warrant . . . or did not endorse on the warrant the date and time of issuance and the name of the officer to whom the warrant was issued[.]"

At the suppression hearing, the search warrant was received as an exhibit and reflects that on January 30, 2018, the affidavit was sworn by Detective McKlean in front of the trial judge. On the same day, the same trial judge signed the search warrant, and the warrant was issued at 9:55 p.m. The search warrant stated, "Proof by Affidavit having been made before [the trial judge] by Detective Santiago Mc[K]lean, and said affidavit being incorporated by reference into this warrant[.]" The trial court found that this clearly expressed that the affidavit was sworn in front of the trial judge before the warrant was issued, and the evidence does not preponderate against the trial court's finding. *See State v. Dellinger*, 79 S.W.3d 458, 471 (Tenn. 2002). Accordingly, the Defendant is not entitled to relief on this basis.

### IV.    *Brady* Violation

The Defendant argues that the trial court erred by denying his motion for a mistrial based on the State's failure to disclose the victim's recollection during trial testimony that the Defendant slept all night in the same bed with him during the aggravated sexual battery incident, in violation of *Brady v. Maryland*. The State responds that the Defendant was able to effectively examine and use the victim's statement at trial and that no violation occurred.

A jury-out hearing occurred before the victim testified so that the victim could testify about his changed recollection of the Defendant's actions. The victim testified that he had a forensic interview with "Ms. Barnes" regarding the incident. The victim said that there was a detail he told Ms. Barnes that he later remembered differently. The victim explained that when he spoke to Ms. Barnes he intended to tell her the truth and that, to the best of his ability, he recalled the events as he remembered them at the time of the interview. On cross-examination, the victim said that before the jury-out hearing testimony, he had not said that the Defendant had been sleeping in the bed beside the victim the whole night on the night of the incident. The victim agreed he had not mentioned this during his forensic interview or the preliminary hearing. The victim said that two days

before trial, he told the prosecutor he remembered the Defendant slept in the bed with him all night. On redirect examination, the victim said that during his forensic interview when he told Ms. Barnes that the Defendant did not sleep next to the victim during the night, he believed he was telling the truth based on his memory. The victim explained that at the time of trial, he remembered differently that the Defendant had slept next to him all night. The victim said that he did not lie intentionally during his forensic interview or during the preliminary hearing.

Following the victim's testimony, defense counsel made a motion for a mistrial, arguing the State had committed a *Brady* violation. Counsel argued the difference between the victim's forensic interview and preliminary hearing testimony and the victim's trial testimony was significant. Counsel argued that the State had violated *Brady* by not disclosing the victim's new testimony that the Defendant slept in the same bed as the victim on January 30. Counsel requested a mistrial because he had not prepared for "totally different facts." The State responded that the victim changed his testimony a few days before trial, that defense counsel had the forensic interview and the preliminary hearing transcript, and that counsel would have the opportunity to cross-examine the victim regarding any discrepancies in his testimony. The State argued that there was no intentional failure to disclose *Brady* material and any failure to disclose would be cured by counsel's ability to cross-examine the victim.

The trial court found that the State did not fail to disclose *Brady* material to the defense intentionally and that remedies were available to the defense because defense counsel would have the opportunity to question the victim about discrepancies in his testimony. The court found that the victim's memory of the Defendant's sleeping with him all night did not materially affect the defense and that defense theories were still "intact." The court denied defense counsel's motion for a mistrial. The court reasoned it had remedied the situation by allowing the defense to voir dire the victim before his trial testimony. Also, the court granted a continuance sua sponte for the remainder of the afternoon to allow the defense to "gather any other information," "process" the new information, and to prepare a defense.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal

-14-

defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

In order to show a due process violation pursuant to *Brady*, the defendant must prove by a preponderance of the evidence that (1) he requested the information, unless it is obviously exculpatory, (2) the State must have suppressed the information, (3) the information must be favorable to the accused, and (4) the information must be material. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Favorable evidence includes that which "challenges the credibility of a key prosecution witness." *Johnson*, 38 S.W.3d at 56-57 (internal quotation marks and citation omitted). Evidence is material when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 58 (quoting *Edgin*, 902 S.W.2d at 390).

In *Clark Beauregard Waterford, III v. State*, No. M2017-01968-CCA-R3-PC, 2018 WL 5014240, at *10 (Tenn. Crim. App. Oct. 16, 2018), *perm. app. denied* (Tenn. Mar. 27, 2019), a panel of this court explained

> The prosecution's obligation to disclose exculpatory material is satisfied when the material is disclosed in time for the defendant to use it effectively at trial. *See United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (finding no *Brady* violation where the material was disclosed at trial and the defendant refused an opportunity to postpone the trial); Wayne R. LaFave *et al.*, 6 Crim. Proc. § 24.3(b) n.88 (4th ed. 2017). "Although the complete non-disclosure of significant exculpatory evidence often makes an easy case for a due process violation, delayed disclosure requires an inquiry into whether the delay prevented the defense from using the disclosed material effectively in preparing and presenting the defendant's case." *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting). Because a violation occurs only when the suppression of material exculpatory evidence prevents its effective use at trial, "'*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose.'" *State v. Justin Terrell Knox*, No. W2014-01577-CCA-R3-CD, 2015 WL 6122257, at *4 (Tenn. Crim. App. Oct. 16, 2015) (quoting *Davis*, 306 F.3d at 421).

We conclude that the record supports the trial court's finding that no *Brady* violation occurred. The State did not suppress the victim's memory that the Defendant slept in the same bed as the victim on January 30 because the information was disclosed in time for the Defendant to use it effectively at trial. *See Clark Beauregard Waterford,* III, WL 5014240, at *10. A jury-out hearing was conducted to assess the victim's testimony, and the trial court suspended the trial for the remainder of the day so that defense counsel would

-15-

have an opportunity to consider the new information and to prepare the defense. At the trial, defense counsel extensively cross-examined the victim about inconsistencies in his forensic interview and preliminary hearing testimony and his trial testimony. The victim confirmed that he only recently remembered that the Defendant slept all night in the same bed with the victim. The victim testified that the Defendant normally did not sleep in the same bed as the victim. In opening argument, defense counsel had asked the jury to pay attention to the details, especially the details of the victim's version of events. During closing argument, defense counsel emphasized the victim's inconsistent statements and argued the victim's testimony was unreliable. Though there was a delayed disclosure of the victim's testimony regarding where the Defendant slept, Defense counsel was able to utilize the new information effectively at the trial. The trial court did not abuse its discretion by denying the Defendant's motion for a mistrial because no manifest necessity arose. Accordingly, the Defendant is not entitled to relief on this issue.

### V.    Juror Misconduct

The Defendant argues that the trial court erred by denying his motion for a mistrial based on juror misconduct. The Defendant contends that his right to a fair trial was violated because of the failure by Juror 11 to disclose a prior relationship with the victim's family. The State responds that the trial court did not err by denying the Defendant's motion for a mistrial.

We note that a mistrial cannot be granted after the jury verdict has been accepted by the trial court. In the present case, the issue was not known to the parties or the trial court before the verdict was returned and accepted by the trial court, therefore a mistrial was not an available remedy. *See* T.R.A.P. 36(a). However, the Defendant raised juror misconduct as an issue in the motion for a new trial, and the trial court determined that the Defendant failed to establish reversible trial error relative to the alleged juror misconduct. We will consider whether the trial court erred in denying the motion for a new trial on this basis. *See* Tenn. R. Crim. P. 33; T.R.A.P. 3(e) (stating that an issue of juror misconduct must be raised in the motion for a new trial or will be considered waived on appeal).

After trial but before the sentencing hearing, the trial court received an anonymous letter:

> It was brought to my attention that a jury member that was added (not on the original list) the day of selection was [and] *is [M.T.']s COUSIN!*

> His name is [Juror 11]. We did a very bad thing by convicting [the Defendant]. That entire trial was laced with *lies*. This juror may have been Planted!!

> I'm sending this letter anonymously because I'm in Fear of Retaliation.

*Please Do The Right Thing Judge.* I can't sleep at night. I wonder how anyone else involved in convicting this innocent young man can either.

We sent an innocent man to jail.

(Emphasis in original.)

The trial court forwarded the letter to the State and defense counsel. Defense counsel filed a motion for a mistrial, and a hearing was held.

At the hearing, defense counsel entered as exhibits a transcript of the jury voir dire and the jury roll call, the jury roll call report, the jury list, and the voir dire report.

David McNeely testified that the Defendant was a family friend and that he attended the first day of trial and observed the jury voir dire. Mr. McNeely explained that he had a "direct line sight" of the voir dire proceedings. Mr. McNeely said that during roll call, Juror 11 raised his hand and said that his name had not been called. Mr. McNeely said that someone in the courtroom "did some paperwork" and that Juror 11 was added to the roll call. Mr. McNeely said he observed the trial judge ask the potential jurors if anyone knew the victim or the victim's family. Mr. McNeely said that he was seated two seats over and in the same row as Juror 11 when this question was asked and that Juror 11 did not raise his hand in response. Mr. McNeely said that he remembered Juror 11 because Juror 11 arrived late.

Mr. McNeely testified that after the trial, he noticed "a lot of unusual things" about Facebook posts purportedly made by Juror 11. Mr. McNeely said that he viewed Facebook posts involving communication between Juror 11 and M.T., the victim's mother. Mr. McNeely said that after he realized that Juror 11 and M.T. knew each other, he viewed Juror 11's Facebook friends list. He observed that Juror 11 was Facebook friends with M.T.; the victim's father; and the victim's two sisters. Mr. McNeely explained that approximately three days after trial when he realized Juror 11's identity, he attempted to view Juror 11's previous Facebook posts, but the posts from Juror 11's account had "disappeared."

Mr. McNeely testified that Juror 11 was not the only potential juror to arrive late. He said that no one objected to the late-arriving individuals being added to the roll call. Mr. McNeely said that he viewed Juror 11's Facebook page a few days after the trial and then sent an email to defense counsel regarding Juror 11. Mr. McNeely said that all of the jurors were asked if they had any biases or prejudices related to the case and that Juror 11 never raised his hand to indicate he had any biases or prejudices. Mr. McNeely explained that the oldest of Juror 11's Facebook posts was in 2013 and that he did not remember the

date of the most recent post.  Mr. McNeely said that he did not see anything in Juror 11's posts about the Defendant's case.

Pamper Cochran testified that the Defendant was her neighbor and that she attended his trial.  Ms. Cochran said that after the trial, she viewed Juror 11's Facebook page.  Ms. Cochran identified a printout of a Facebook post dated February 3, 2013, in which Juror 11 posted on the victim's father's page, "Happy birthday []."  The printout was received as an exhibit.  Ms. Cochran said that this post is what "triggered the entire search."  She identified a printout of Juror 11's Facebook page.  She explained that she scrolled through Juror 11's page and discovered he was one of the jurors at the Defendant's trial.  Ms. Cochran identified a printout of Juror 11's Facebook friends list.  She said the list had names she recognized, including: the victim's two sisters and the victim's father.  Ms. Cochran identified a printout of the victim's father's Facebook page and friends list and said the page had a picture of the victim's family, including M.T. and the victim.  The documents were received as a collective exhibit.

Ms. Cochran testified that she searched Juror 11's Facebook page and found a post stating, "I love you too, [M.T.]."  Ms. Cochran said that a few days after the trial, she attempted to view M.T.'s Facebook page, but the page had been deactivated.  Ms. Cochran said about one week later, M.T.'s Facebook page was active again.  She said the photos on M.T.'s page matched the appearance of M.T., who testified at the Defendant's trial.  A printed document depicting a post on Juror 11's page stating, "Love you to [M.T.]," was received as an exhibit.

Ms. Cochran testified about extensive personal Facebook messages and comments between Juror 11 and the victim's family on March 3, 2011; March 6, 2011; February 10, 2013; April 27, 2014; March 17, 2015; April 5, 2019; April 7, 2019; June 1, 2019; and June 4, 2019; copies of which were received as exhibits.  The comments included references to their familial relationships and indicate that Juror 11 and the victim's family were friendly with each other.

B.P. testified that Juror 11 was her son and that she knew the victim's family.  She said that Juror 11 also knew the victim's family.  B.P. said that she had not sent Facebook messages to M.T.  B.P. acknowledged that on November 29, 2017, she posted on one of the victim's sister's Facebook page: "Happy birthday, love you[,]" to which the sister responded, "Thank you!"  B.P. stated that she knew the victim's sister in the exchange was M.T.'s daughter.  B.P. viewed a printed exhibit of a Facebook interaction from June 2019 and acknowledged that she had contact with M.T.  B.P. reviewed the printout of Facebook posts received as exhibits and said that she remembered these interactions with M.T. and verified they were accurate depictions.  She said that B.P.'s brother, M.L.W., had been married to M.T.'s aunt and that members of the victim's family referred to B.P. as "Aunt B," even after M.L.W. died.  B.P. said that Juror 11 and the victim's family attended her brother's funeral.  B.P. said that she maintained contact with the victim's family, mostly

through Facebook, and that she did not know if Juror 11 had contact with the victim's family. B.P. said that her brother died on July 22, 2016. A copy of his obituary was received as an exhibit. B.P. said that after her brother died, the victim's family did not attend family gatherings and did not spend time at her home. B.P. said that she had a "looser connection" with a "Facebook friend" than a "real life, good friend."

Juror 11 testified that he knew of the victim's father but that he did not know him "personally." Juror 11 said that he knew M.T. by another first name. He said that when he saw her in the courtroom, he realized that he knew her. Juror 11 said he "knew of" the victim's two sisters and "knew nothing" of the victim. Juror 11 said that he had never seen the family all together in person. Juror 11 said that he did not know if he was connected with any of the victim's family members on Facebook. Juror 11 reviewed a collective exhibit and confirmed that it contained a printed copy of his Facebook friends list, which included the victim's father and the victim's two sisters.

Juror 11 testified that he saw the victim and M.T. testify during the trial. He said that he did not tell the trial court that he recognized either of them. Juror 11 said that he raised his hand when the jury was asked if any of the prospective jurors knew the victim's father. He said he raised his hand because he knew four people with the same name as the victim's father. Juror 11 said that he did not raise his hand when the prospective jurors were asked if any of them knew M.T. because he did not know who she was. Defense counsel read the following from the jury voir dire transcript: "Are any of you prospective jurors kin by blood or marriage to the alleged victim . . . ? Does anyone know, [the victim] . . . or his parents, [P.T.] or [M.T.]. All right. No hands." Juror 11 said that he raised his hand in response to these questions but said that he "didn't have it high." Juror 11 said that the judge did not comment after he raised his hand. Juror 11 explained that he raised his hand regarding the victim's father. Juror 11 said that when the judge acknowledged that no hands were raised in response to questions about knowing the victim's family, the judge was mistaken. Juror 11 said he "barely . . . raised my hand up and sat it right back down." Juror 11 said he heard the trial court say, "no hands." When asked why he did not say anything, Juror 11 said, "If I don't know the person, personally, then, no I didn't." Juror 11 stated that he knew "of" the victim's father but that he did not know him personally.

Juror 11 testified that he was related to M.T.'s aunt by the aunt's marriage to his uncle, M.L.W. He said that he was not related to the victim or the victim's parents. Juror 11 said that he attended M.L.W.'s funeral and that he did not know if anyone from the victim's family attended. Juror 11 reiterated that he did not know personally any of the victim's family. He said that he had talked to M.T. on several occasions approximately six or seven years before the trial. Juror 11 said he had not spoken to anyone in the victim's family in the three or four years before the trial. Juror 11 identified a printed copy of a Facebook post in which he said to the victim's father, "Happy birthday." Juror 11 reviewed another exhibited document and identified a Facebook post in which he said to M.T., "Love you, too, [M.T.]." Juror 11 explained that he was "a caring person" and cared for "anybody

that was . . . kin to me." Juror 11 identified an exhibit showing a Facebook conversation he had with M.T. regarding his nephew and confirmed that this was an accurate depiction of their interaction. Juror 11 said that he heard his parents mention that M.T.'s daughter was sick and that he had asked her about her daughter. Juror 11 identified the exhibit showing M.T.'s Facebook comment "love you fam," and Juror 11 said he responded, "We love you, too, [M.T.]." Juror 11 said his comment, "didn't mean anything." Juror 11 reviewed the exhibit in which M.T. and Juror 11 had a Facebook conversation. Juror 11 explained that the victim's parents might have seen him walking with B.P., who had known the victim's family "a whole lot longer" than he. Juror 11 did not deny that M.T.'s comment indicated that she had seen Juror 11 more than once in person. Juror 11 acknowledged that he created a Facebook post about food in 2014 and that he tagged M.T. on this post. He explained that he tagged her because she had posted about food and tagged Juror 11 in her posts. Juror 11 agreed that he tagged M.T. in another Facebook post regarding food about one year later.

Juror 11 testified that he did not know M.T. well. When asked why he was friends on Facebook with members of the victim's family, Juror 11 said, "My parents are on my Facebook, too. So at that time if they were all doing games and stuff and [the victim's family] got added to it, because I don't do Facebook games." Defense counsel asked Juror 11 if someone else added the victim's family as friends to his Facebook account, and he replied, "I'm not testifying that someone added. I said, I do not know if they got added by me or my parents."

Juror 11 testified that he recalled the trial judge reading the witness list aloud. Juror 11 said that the judge administered an oath during jury voir dire, that he knew what it meant to lie under oath, and that he knew lying under oath was a crime. Juror 11 said that he did not lie under oath and that he was "worried" about the outcome of this hearing.

Juror 11 testified that he was not biased or prejudiced based on M.T.'s testimony. Juror 11 agreed that it was important to listen to the facts when someone was charged with a crime. Juror 11 said that he gave the Defendant a fair and impartial trial. Juror 11 said that he did not discuss his acquaintance or knowledge of M.T. with any other jurors or anyone else. Juror 11 said that it was his understanding that he was not and never had been related to M.T. and that when asked if he were related to the victim or the victim's family, he answered honestly. Juror 11 said that since his uncle died in July 2016, he had not spoken in person to M.T. Juror 11 said that he "didn't even know of" the victim. Juror 11 said that he did not place much value on Facebook. He said it was common to say "happy birthday" to Facebook acquaintances. Juror 11 said that he never intentionally misled the court when he was asked questions during voir dire. He said that he never intentionally did not answer a question. Juror 11 said that none of the questions asked during voir dire caused him to believe that he could not be fair and impartial.

-20-

On redirect examination, defense counsel asked Juror 11 about the four men with the same name as the victim's father. Juror 11 said that two were white and that two were black. Juror 11 said that he knew the four men through Facebook but that he did not know if the four men were his Facebook friends. Juror 11 viewed the exhibit containing his Facebook friends list and acknowledged that the victim's father was the only person with that name on his friends list. Juror 11 said that he was not the only juror that raised his hand during jury voir dire. He explained that when asked if anyone knew the victim's family "other people" also raised their hands, including a man sitting "up front." Juror 11 said at least three other people raised their hands. He said that it was not true when the trial judge said, "No one raised their hand." Juror 11 said that during voir dire, he raised his hand when asked if anyone knew the victim's father and did not raise his hand when asked if he knew M.T. because he knew her by a different first name. Juror 11 said that he recognized M.T. when she took the stand to testify at trial but that he did not tell the judge he knew her because he did not have any bias.

Juror 11 testified that he received a letter dated July 12, 2019, to appear for jury duty, and the letter was received as an exhibit. Juror 11 explained that he completed and mailed in the required paperwork, but when he arrived for jury duty, the court did not have his paperwork. Juror 11 said that he arrived for jury duty as instructed in the letter. He said that he completed the paperwork again.

Defense counsel argued that Juror 11 was present during jury voir dire and that the record reflected that no one raised their hand when the trial court asked the jurors whether any of them knew the victims or his parents. Counsel said that Mr. McNeely testified that Juror 11 did not raise his hand during voir dire when asked if anyone knew the victim's family. Counsel argued that even if Juror 11 raised his hand as he testified, he only raised his hand to indicate that he knew the victim's father. Counsel argued that Juror 11's failure to inform the court he knew the victim and the victim's parents raised a presumption of bias.

The State argued that Juror 11 did not intentionally mislead the trial court. The State argued that there was no familial connection between Juror 11 and the victim's family and that the connection was "a very loose previous relationship by affinity." The State argued that any familial connection ended when Juror 11's uncle died. The State concluded that Juror 11 unequivocally testified he was not biased and gave the Defendant a fair trial.

The trial court said it would take the matter under advisement and issue a written order. The court found on the record that there was no question that Juror 11 was sent a letter from the court and was chosen by the parties to be on the jury. Juror 11 was not "somebody off the street that just came in here and was planning to be a juror."

In a written order, the trial court denied the Defendant's motion for mistrial based on juror misconduct. The court reasoned that Juror 11 received a jury summons and was

required to appear for jury duty and that Juror 11, along with two other individuals, were not listed on the jury roll call report or the voir dire report because they either failed to return the appropriate paperwork to the court clerk or the clerk did not receive the paperwork. The court explained that the three individuals were properly on the jury panel and their cards were added to the group from which the court randomly selected cards containing the names of 48 potential jurors. The court reasoned that the Defendant had the opportunity to question Juror 11 about his "late addition" or could have used a peremptory challenge and that the Defendant never objected to Juror 11's not being on the initial roll. The court concluded that this issue was waived.

The trial court determined that Juror 11 was not a relative of M.T. because the familial connection ended with the death of Juror 11's uncle. The uncle's death ended his marriage with M.T.'s aunt, and this was the only familial connection between Juror 11 and the victim's family. Regarding whether Juror 11 intentionally gave false answers to voir dire questions, the court referenced the following voir dire questions: "Are there any prospective jurors kin by blood or marriage to the alleged victim? Does anyone know [the victim]? . . . Or his parents, [the victim's father and M.T.]?" The court determined that the "crux of the question[] was centered around kinship" and that the "cadence of delivery indicated as much." The court noted that Juror 11 was no longer related to the victim's family and that Juror 11 testified that he was not related to the victim's family.

During voir dire, the trial court read a list of potential witnesses and asked the jurors (1) if any juror knew someone on the list and (2):

> [By] show of hands, is there anyone among you jurors who has had an experience with one of those witnesses, good or bad, which you could not put aside and evaluate that witness['s] testimony, based solely alone upon the evidence that's heard during the trial? Meaning you could set that relationship aside, you might have known them from high school or from whatever the case may be. But question two is, can you set that relationship aside and base your evaluation of their testimony and their credibility on what you hear in court, and not on something you hear outside of court?

Referring to the record, the trial court noted that several jurors raised their hands after question one but that each person put their hand back down after question two. The court reasoned that none of the listed witnesses were present during voir dire and that Juror 11 testified that he knew M.T. by another first name. The court credited Juror 11's testimony that he did not notify anyone he knew M.T. when she testified because he recalled the court's prior questioning and believed he could "render an unbiased verdict, free from prejudice." The court credited Juror 11's testimony that he raised his hand to indicate that he knew the victim's father and put his hand down when the court asked question two, which signified Juror 11 could set aside that relationship and "base his decision on the witnesses' credibility, based on what's heard in court and not on some external factors."

-22-

The trial court credited Juror 11's testimony regarding any fact in dispute and determined that Juror 11 "indicated to the [c]ourt that he could set aside any outside information and any past or present relationship, and could be fair and impartial in the trial." The court noted that Juror 11 said he did not know the victim. The court found that the Facebook posts between Juror 11 and M.T. occurred at least six years before the trial, that they did not establish a familial connection, and that any "perceived closeness" existing at the time of the Facebook posts "would have dissipated" by the time of the trial. The court credited Juror 11's testimony that he had not communicated with any member of the victim's family in years. The court credited Juror 11's testimony that he knew nothing of the case before voir dire and that Juror 11 "would have said something" if he had known anything. The court found that Juror 11 had been on several juries before the Defendant's trial and that Juror 11 understood his responsibilities to be fair and impartial. The court concluded that Juror 11 and the victim's family were not close friends at the time of the trial, that Juror 11 did not intentionally mislead the court, and that Juror 11 had no bias or prejudice. The court reasoned that the jury did not convict the Defendant of sexual exploitation of a minor by electronic means or its lesser included offenses, further supporting the court's determination that the Defendant received a fair and unbiased trial. The court denied the Defendant's motion for a mistrial.

"The right to a jury trial in both civil and criminal cases is a foundational right protected by both the federal and state constitutions." *State v. Smith*, 418 S.W.3d 38, 44 (Tenn. 2013). Article I, section 9 of the Tennessee Constitution states, in pertinent part, "[t]hat in all criminal prosecutions, the accused ha[s] the right . . . in prosecutions by indictment or presentment, [to] a speedy public trial, by an impartial jury of the County in which the crime shall have been committed [.]" "An unbiased and impartial jury is one that begins the trial with an impartial frame of mind, that is influenced only by the competent evidence admitted during the trial, and that bases its verdict on that evidence." *Smith*, 418 S.W.3d at 45.

"The ultimate goal of voir dire is to ensure that jurors are competent, unbiased[,] and impartial." *Smith v. State*, 357 S.W.3d 322, 347 (Tenn. 2011) (quoting *State v. Hugueley*, 185 S.W.3d 356, 390 (Tenn. 2006)). Challenges to a juror's qualifications fall into two categories: *propter defectum* ("on account of defect") or *propter affectum* ("on account of prejudice"). *Carruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003) (citing *State v. Atkins*, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993)). *Propter defectum* challenges are "based upon general disqualifications, such as alienage, family relationship, or statutory mandate" and must be raised prior to the return of the verdict. *Id. Propter affectum* challenges are "based upon the existence of bias, prejudice, or partiality towards one party in the litigation actually shown to exist or presumed to exist from the circumstances" and may be raised after the verdict in a motion for new trial. *Id.* Here, the Defendant raises a *propter affectum* challenge by alleging bias by Juror 11.

This court has recognized that "the essential function of the voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel." *Atkins*, 867 S.W.2d at 354. Counsel's full knowledge of the facts which might bear upon a juror's qualifications "is essential to the intelligent exercise of peremptory and cause challenges[.]" *Id.* at 355. Thus, "jurors are obligated to make 'full and truthful answers . . . neither falsely stating any fact nor concealing any material matter.'" *Id.* (quoting 47 Am. Jur. 2d, Jury § 208 (1969)).

The Defendant bears the burden of establishing a prima facie case of bias or partiality. *Id.* (citing *State v. Taylor*, 669 S.W.2d 694, 700 (Tenn. Crim. App. 1983)). "When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises." *Id.* When asked a question reasonably calculated to produce an answer, a juror's silence is "tantamount to a negative answer." *Id.* The State may rebut the presumption of bias by establishing the "absence of actual partiality" or "actual prejudice[.]" *Id.* at 357. Actual prejudice may be demonstrated "by the challenged juror's conduct during jury deliberations which give rise to the possibility that improper extraneous information was provided to the jury." *Id.* To determine whether the presumption of prejudice is overcome, the trial court "must view the totality of the circumstances, not merely the juror's self-serving claim of lack of partiality[.]" *Id.*

A constitutional claim that is resolved following an evidentiary hearing is reviewed by appellate courts as a mixed question of law and fact. *State v. Adams*, 405 S.W.3d 641, 656 (Tenn. 2013) (citing T.R.E. 606(b); *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 305 (Tenn. 2005)). This court reviews a trial court's factual findings, such as credibility and weight afforded to a witness's testimony, under a de novo standard, accompanied by a presumption of correctness unless the evidence preponderates otherwise. *Adams*, 405 S.W.3d at 656 (citing T.R.A.P. 13(d); *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001)). The trial court's conclusions of law, "such as whether a jury's verdict was affected by extraneous prejudicial information or an improper outside influence," are reviewed under a de novo standard, with no presumption of correctness. *Id.* (citing *Fields*, 40 S.W.3d at 458).

In this case, we must determine whether the Defendant established a prima facie case of bias when Juror 11 failed to reveal his connection to the victim's family. Juror 11 testified that he raised his hand during voir dire in response to questions asking if the jurors knew the victim or his parents. Juror 11 said that he "knew of" four people with the same name as the victim's father, which was why he raised his hand. Juror 11 said that no one asked him any follow-up questions after he raised his hand. Juror 11 said that he did not know M.T. by the first name used by the trial court and the lawyers. However, he admitted that he recognized M.T. during her trial testimony and acknowledged that he did not notify the court. This court has noted that when a juror provides a false or misleading response during voir dire, intent is not dispositive but raises a presumption of prejudice. *Atkins*, 867

S.W.2d at 355. Juror 11 said that he had interacted with M.T. on Facebook several years before the Defendant's trial and that Juror 11 had been related to her through the marriage of M.T.'s aunt and Juror 11's uncle, though the uncle died several years before the trial. On one occasion, Juror 11 wished the victim's father a "happy birthday" on Facebook, and he was Facebook friends with the victim's sisters. Contrary to Juror 11's testimony, Mr. McNeely testified that he was seated near Juror 11 and that Juror 11 did not raise his hand when the jurors were asked if any of them knew the victim or his parents. Moreover, the transcript reflects the same.

The record reflects that Juror 11 knew the victim's parents. We note several of the Facebook interactions occurred several years before the trial; however, the interactions clearly establish a relationship between Juror 11 and the victim's parents. Juror 11 admitted his failure to disclose this relationship to the trial court even after M.T. testified. The record reflects that none of the jurors raised their hand when asked if they knew the victim or the victim's parents. We conclude that the evidence preponderates against the trial court's findings that Juror 11 did not willfully conceal information about his relationship with the victim's parents. Thus, a presumption of prejudice arose. The State failed to offer any evidence, aside from Juror 11's self-serving testimony that he had no bias or prejudice, to overcome the presumption of prejudice. At the hearing, the State called no witnesses and offered no evidence, aside from Juror 11's testimony. In its order denying the Defendant's motion for a mistrial, the trial court relied heavily on Juror 11's testimony that he was unbiased. *See Atkins*, 867 S.W.2d at 354 (To determine whether the presumption of prejudice is overcome, the trial court "must view the totality of the circumstances, not merely the juror's self-serving claim of lack of partiality[.]") In *Hyatt v. State*, 430 S.W.2d 129, 130 (1967), this court noted that where "'the jury or juror has prejuded the case, and the knowledge of bias or prejudice is unknown until after the verdict, the courts say it must be presumed that [the juror's] prejudices enter into and become a part of the result[.]'" *Id.* (quoting *McGoldrick v. State*, 21 S.W.2d 390, 391 (Tenn. 1929)). Accordingly, we reverse the Defendant's conviction for aggravated sexual battery and remand the case for a new trial.

## VI.    Sentencing

Our conclusion that the trial court erred by denying the Defendant's motion for a new trial based on juror misconduct is dispositive of this appeal. However, because of the possibility of further review, we will address the remaining issues. *See*, *e.g.*, *Jacobs v. State*, 450 S.W.2d 581 (Tenn. 1970) (mem.) (stating that the intermediate court erred by pretermitting its consideration of the remaining issues after concluding that error existed as to one issue); *State v. Pendergrass*, 13 S.W.3d 389, 395 (Tenn. Crim. App. 1999) (concluding that, despite insufficiency of the evidence to support the Defendant's convictions, an intermediate court must, nevertheless, address the merits of the remaining issues).

The Defendant contends that the trial court erred by sentencing him to eleven years. Specifically, the Defendant argues that the trial court erred by the weight it gave to enhancement and mitigating factors and by failing to consider statutorily mandated sentencing considerations and principles. The State responds that the trial court did not err by sentencing the Defendant to eleven years.

At the sentencing hearing, the presentence report was entered as an exhibit. The report stated the Defendant was court martialed by the United States Coast Guard after he received convictions for possession of child pornography, indecent conduct with a minor, attempt to commit child sexual abuse, and indecent conduct with a child. These convictions were "overturned," and he was discharged "under honorable conditions." The Defendant had a pending charge for tampering with evidence and a dismissed charge for violation of the sex offender registry. The Defendant was a high school and college graduate, and received a certification for search and rescue. The Defendant rated his mental health as "poor" and reported he was diagnosed with PTSD, ADHD, depression, anxiety, and other mental health issues he could not remember. He attended therapy, counseling, and anger management sessions a few times a week. He took medications related to his mental health issues that had been prescribed to him before his incarceration. The Defendant reported that he did not use illegal drugs and that he consumed alcohol occasionally. He reported that he had a good relationship with his family and that he had moved to Tennessee to care for his aunt. He had been employed as a construction worker, fireman, cashier and lineman at Taco Bell, and as the head lifeguard at a recreational center. The Defendant had served in the Coast Guard. The Strong-R assessment reflects that the Defendant has a moderate risk to reoffend.

Tennessee Department of Correction employee Libbi Stejskal testified that she prepared the Defendant's presentence report. Ms. Stejskal said that she spoke to the victim's mother, who provided a victim impact statement on behalf of the victim. The victim impact statement was received as an exhibit. Ms. Stejskal explained that the statement indicated that the victim was going through a "rough patch" emotionally and physically. Ms. Stejskal said that during her investigation, she took a written statement from the Defendant, who maintained his innocence and claimed that the victim had lied.

Ms. Stejskal testified that while gathering information for the presentence report, she investigated the Defendant's criminal history. Ms. Stejskal said that she learned the Defendant, while in the Coast Guard, was convicted of possession of child pornography, indecent conduct with a minor, and attempt to commit child sexual abuse. She said that a military appellate court overturned these convictions. Ms. Stejskal testified that the Defendant took medications for mental health issues. She said that the Defendant had been employed as a fireman and had no criminal history while he was in "civilian life."

Rebecca Selden testified that she employed the Defendant from October 2008 to April 2010 as a babysitter for her two sons, who were ages seven and eight when the

Defendant began watching them. Ms. Selden explained that she knew the Defendant's mother and that the Defendant had "high recommendations." Ms. Seldon said that she learned some information regarding the Defendant and her sons which prompted her to contact the police department. Ms. Selden said she had doubts about the Defendant and that her sons were "troubled."

Pamela Grey testified that she was the Defendant's aunt and that she was diagnosed with a brain tumor in 2017 and that the Defendant moved to Tennessee to live with and help care for her after her brain surgery.

David McNeely testified that he had known the Defendant for thirteen years. He said he met the Defendant at an off-road vehicle organization. Mr. McNeely said the goal of the organization was to "promote goodwill" and improve the group's "image in the community." Mr. McNeely said that the group hosted events and the proceeds went to a pediatric hospital and a police officers' association. He said the Defendant volunteered with the Tennessee parks and recreation department and the Salvation Army. Mr. McNeely said that he dated the Defendant's mother. He said he was aware the Defendant had some trouble while he was in the Coast Guard, but he did not know any details.

Dixie Trible testified that she had known the Defendant for eight years because the Defendant was friends with her son. Ms. Trible said that her son "was into drugs" and involved with gang members. She explained that the Defendant was a positive influence and convinced her son to attend school. Ms. Trible said the Defendant continued to offer help to her son and helped her son become a "good citizen." Ms. Trible said that she knew the Defendant spent some time in confinement because of trouble with the Coast Guard.

Rachel Douglas testified that she had known the Defendant for four years and that they met on a dirt bike riding trip. She said the Defendant helped her by motivating her to exercise and by going to a gym with her. Ms. Douglas said that she and the Defendant participated in a dirt bike race, that her bike got stuck, and that he sacrificed his place in the race to help her. She said that the Defendant also helped her by painting her truck.

Pamper Stanford testified that she knew the Defendant because he rented a mobile home from her mother. She said that the Defendant helped her replumb a bathroom and that he helped her family build a dirt bike track. She said the Defendant painted her parents' house and did other "handyman jobs" for them. Ms. Stanford said that the Defendant spent time with her grandchildren and that none of them had any issues with the Defendant.

Joseph Muleski testified that he had known the Defendant for over twelve years. Mr. Muleski explained that his son and the Defendant were friends. Mr. Muleski said that the Defendant volunteered for many community service activities. He said the Defendant helped with dirt bike trail maintenance and assisted people who were stranded on trails.

Mr. Muleski explained that on one occasion, the Defendant helped a family stranded in a remote area and hauled their vehicle thirteen miles to the family's home.

Michael Geerts testified that he had known the Defendant for approximately fifteen years and that the Defendant was a "great person" who was willing to help anyone. Mr. Geerts said the Defendant had rescue training and helped many people stranded or injured on dirt bike trails. He explained the Defendant did this on a volunteer basis every weekend for approximately six or seven years.

Andrew Ogden testified that he had known the Defendant for approximately two and one-half years. He said the Defendant was "always willing to lend a helping hand" to people. Mr. Ogden explained the Defendant helped Mr. Ogden's mother manage her anxiety. He said the Defendant gave him dirt bike parts when needed and was willing to pay for other things, such as meals and gas, for others.

Assistant Attorney General Lee Brooks testified that he had served in the United States Marine Corps and was familiar with the form DD214. He explained the form discharges a member of the military from their military status back to civilian life. General Brooks reviewed the document entered as Exhibit 5 and said it was the Defendant's DD214 discharge form. He explained the form indicated the Defendant was discharged "under honorable conditions," which he explained was different than an "honorable discharge." He said that the "narrative reason for separation" was misconduct. He said the form also indicated that the Defendant would not be able to re-enlist in the armed forces.

The Defendant read a statement in which he said his "life's journey" was to help others. The Defendant said he had never caused emotional or physical harm to anyone. He said he did volunteer work and joined the Coast Guard, which ended with an "honorable discharge." The Defendant said he received a Presidential Award for volunteer work. He said that he had first responder training and that he moved to Tennessee to help care for his aunt, who was recovering from surgery. He said that he helped the victim and his family and that this put the Defendant in a vulnerable position. He asked that justice be done on his behalf.

The trial court considered the evidence presented at the hearing and at the trial, the presentence report, the principles of sentencing, the nature of the criminal conduct involved, statistical information provided by the Administration Office of the Courts regarding sentencing, and the Defendant's statement. The court considered the enhancement and mitigating factors as specified in Tennessee Code Annotated section 40-35-113 and -114. The court determined in its review of enhancement factors that the Defendant had a previous history of criminal behavior but gave no weight to this factor because the convictions were overturned. T.C.A. § 40-35-114(1) (2018). The court determined that the Defendant abused a position of private trust in a manner that specifically facilitated the commission of the offense. *Id.* § 40-35-114(14). The court

reasoned that the Defendant met the victim at church and cultivated a friendship with him, resulting in the victim's spending the night at the Defendant's home. The court found that the Defendant earned the victim's and his parents' trust over a period of time and that the Defendant breached a position of trust when he committed the aggravated sexual battery. The court gave "tremendous weight" to this factor. The court found the mitigating factor that the Defendant's conduct neither caused or threatened serious bodily injury; however, the court gave no weight to this factor. *Id.* § 40-35-113(1) (2018). The court found mitigating factor thirteen applied because multiple people testified that the Defendant had helped them throughout their lives but gave "little, if any, weight" to the factor. *Id.* § 40-35-113(13).

The court ordered the Defendant to serve eleven years at 100 percent service. The court considered whether an alternative sentence was appropriate, and the court determined that confinement was necessary to "accomplish the ends of justice." The court considered the Defendant's potential for rehabilitation and ordered the Defendant to be placed on the sex offender registry and community supervision for life, as required by statute. *Id.* § 40-35-103(4).

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, the result of the validated risk and needs assessment conducted by the department and contained in the presentence report, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2018).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The trial court considered the evidence presented at the trial and the sentencing hearing, the presentence report, the Defendant's criminal history, the Defendant's statement at the sentencing hearing, counsel's arguments, and determined the appropriate enhancement and mitigating factors. The court considered the Defendant's potential for rehabilitation. Moreover, the Defendant was not eligible for probation. *See* T.C.A. § 40-35-303(a) (Supp. 2017) (subsequently amended) (no defendant convicted of aggravated sexual battery shall be eligible for probation); 40-35-501(i)(2)(H) (2018) (subsequently amended) (a defendant convicted of aggravated sexual battery shall serve 100 percent of the sentence). The record reflects that the court properly applied the purposes and principles of the Sentencing Act in determining the Defendant's within range sentence. *See id.* § 40-35-112(a)(2) (2018) (Range 1, Class B felony carries a sentence of eight to twelve years). The Defendant is not entitled to relief on this basis.

Based upon the foregoing and the record as a whole, we reverse the Defendant's conviction for aggravated sexual battery and remand the case for a new trial.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-30-